JUDGE STANTON

542-07/ROSS/PLS

**07 CIV 9544**

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, New York 10005
(212) 425-1900

James L. Ross (JR6411)
Pamela L. Schultz (PS 8675)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

TRANS PACIFIC CARRIERS CO. LTD.,

                Plaintiff,

    - against -

NAIAS MARINE S.A.,

                Defendant

------------------------------------------------------------

**07 CV**



**VERIFIED COMPLAINT**

Plaintiff, TRANS PACIFIC CARRIERS CO. LTD. (hereinafter "TRANS PACIFIC"), through its attorneys Freehill Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant NAIAS MARINE S.A. (hereinafter 'NAIAS") alleges upon information and belief as follows:

## JURISDICTION

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract by Defendant NAIAS. The case also falls within the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333. Jurisdiction is also proper pursuant to the New York Convention on the Recognition and Enforcement of Foreign

Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Arbitration Act, 9 U.S.C. §1 *et seq.* and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.

### THE PARTIES

2.     At all times relevant hereto, Plaintiff TRANS PACIFIC was and still is a foreign business entity organized and existing under the laws of a foreign country with an address at 10th floor, Donghwa Bldg., 58-7, Seosomun-Dong, Jung-Gu, Seoul, Korea.

3.     At all times relevant hereto, Defendant NAIAS was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960.

4.     Plaintiff TRANS PACIFIC was the time-charterer of the vessel STENTOR pursuant to a Charter Party ("C/P") dated August 14, 2007.  Attached is a copy of the C/P (Exhibit A).  This C/P calls for English law and London arbitration (See Clause 31, Exhibit A).

5.     Defendant NAIAS was and is the owner of the vessel STENTOR, who entered into the aforementioned C/P agreement with the Plaintiff.

### FACTS

6.     Pursuant to the C/P (Exhibit A), the Defendant NAIAS agreed to let their vessel STENTOR to the Plaintiff for 2 to 3 voyages over a period of 60 days minimum to a maximum of 100 days (see Line 14 of C/P).  The Plaintiff paid charter hire to the Defendant at a daily rate of $34,500 payable 15 days in advance (See Line 52 of C/P).

7.     Pursuant to the C/P (Exhibit A), the STENTOR performed two voyages for the Plaintiff and the Plaintiff exercised its option for a third voyage, as 38 days

remained on the 100 day maximum time period. With respect to this contemplated third

voyage, the Plaintiff had entered into an agreement to sub-let the vessel to TPL Shipping

Limited for the one voyage. The Plaintiff had the right to sub-let the vessel (See Line 16

of C/P). A copy of the agreed terms and conditions between TRANS PACIFIC and TPL

Shipping Ltd. with respect to this third voyage is enclosed as Exhibit B.

       8.     In breach of its contractual obligations under the C/P (Exhibit A), the

Defendant NAIAS wrongfully withdrew the vessel STENTOR from the services of the

Plaintiff prior to it performing the contemplated third voyage.

       9.     As a result of the aforementioned C/P breach by the Defendant, the

Plaintiff incurred costs, expenses and damages totaling **$1,030,500**, as follows:

    (a)    Estimated overpaid daily hire (15 days
          @$34,500 daily)[1]..........................................$517,500.00

    (b)    Plaintiff's losses under the remaining
          period of the C/P (38 days), including
          the lost revenue of the voyage charter
          party with TPL Shipping..............................$513,000.00

### RULE B MARITIME ATTACHMENT

      10.     This action is brought in order to obtain security in favor of Plaintiff in

respect to Plaintiff's claims against Defendant NAIAS which are subject to arbitration in

London pursuant to English law in accordance with the terms of the aforementioned C/P

(Exhibit A). This action is further brought to obtain security for any additional sums to

cover Plaintiff's anticipated attorney fees and costs in the London arbitration, as well as

interest, all of which are recoverable under English law.

---

[1] The Plaintiff paid the daily hire for the use of the vessel and a contemplated a third voyage, 15 days in advance. The Defendant owners accepted these hire payments, but ultimately refused to perform the third voyage.

11.    Upon information and belief, and after investigation, Defendant NAIAS cannot be "found" within this District for purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that the Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, hire, of, belonging to, due or for the benefit of the Defendant (collectively hereinafter "ASSETS"), including but not limited to ASSETS as may be held, received, or transferred for its benefit, at, moving through, or within the possession, custody or control of banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

12.    The amounts of Plaintiff's claim sought to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims by Plaintiff against Defendants is:

a.    $1,030,500.00 as set forth in paragraph 9 above;

b.    Interest in the amount of $278,235 calculated on the sum of $1,030,500.00 at the rate of 9% per annum, compounded quarterly, for three years, the estimated time it will take to obtain a final arbitration award, which interest is recoverable in arbitration under English law;

c.    Estimated costs, including legal fees, of London arbitration, which are recoverable, in the amount of $250,000.00.

For a total claim amount sought to be attached of **$1,558,735.00.**

\

WHEREFORE, PLAINTIFF prays:

a.    That process in due form of a law according to the practice of this
      Court issue against Defendant NAIAS, citing it to appear and
      answer the foregoing, failing which a default will be taken against
      it for the principal amount of the claim of $1,030,500.00, plus
      interest, costs and attorney fees;

b.    That Defendant NAIAS be compelled to respond in London
      arbitration;

c.    That if Defendant NAIAS cannot be found within this District
      pursuant to Supplemental Rule B that all tangible or intangible
      property of said Defendant, up to and including the claim of
      **$1,558,735.00** be restrained and attached, including, but not limited
      to any cash, funds, escrow funds, credits, debts, wire transfers,
      electronic funds transfers, accounts, letters of credit, of, belonging
      to, due or being transferred from or for the benefit of Defendant
      NAIAS (collectively hereinafter, "ASSETS"), including but not
      limited to such ASSETS as may be held, received, or transferred in
      its own name or as may be held, received or transferred for its
      benefit at, moving through, or within the possession, custody or
      control of banking institutions or even other garnishees who may
      be served with a copy of the Process of Attachment issued herein.

d.    That Plaintiff has such other, further and different relief as this
      Court may deem just and proper in the premises.

Dated: New York, New York
October 25, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
TRANS PACIFIC CARRIERS CO. LTD.

By: _____
James L. Ross (JR 6411)
Pamela L. Schultz (PS 8675)
80 Pine Street
New York, NY 10005
Telephone: (212) 425-1900
Facsimile: (212) 425-1901

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York  )

      JAMES L. ROSS, being duly sworn, deposes and says as follows:

    1.    I am a member of the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

    2.    The sources of my information and the grounds for my belief are communications from our client and documents provided by our client regarding the claims.

    3.    The reason this Verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

                                                              James L. Ross

Sworn to before me this
25th day October 2007

Notary Public

Lisa M. Morales
Notary Public, State of New York
No. 01MO6162004
Qualified in the Bronx
Commission Expires Feb. 26, 2011

# Time Charter

**GOVERNMENT FORM**

Approved by the New York Produce Exchange

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

This Charter Party, made and concluded in _Melbourne_ ..................................................... _46th_ day of _August_ ..................., 19, _2007_

Between _Naios Marine S.A._ ....................................................................................... Owners of the good _Bahamas_ ...................................... _Steamship/Motorship "Glamour"_ ...................................... of _Built 2006,_ .............................. tons gross register, and _31,498_ ............................... tons net register, having engines of .......................... indicated horse power

1  
2 Between _Naios Marine S.A._  
3 Owners of the good _Bahamas_ .............. _Steamship/Motorship "Glamour"_  
4 of _Built 2006,_ .............. tons gross register, and _31,498_ .............. tons net register, having engines of ............ indicated horse power  
5 and with hull, machinery and equipment in a thoroughly efficient state, and classed  
6 at .............................................................  
7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one-and-one-half percent of ship's deadweight capacity, ..............................  of about _37,533.01 / 35,762.45_ cubic feet hold capacity, and about _28,445 metric_ ..................... tons of grain, the  
8 allowing 2 milimeters of fifty tons) on a draft of _9.78 meters_ feet  Summer freeboard, inclusive of permanent bunkers,  
9 which are of the capacity of about ................................................................... tons of fuel, and capable of steaming, fully laden, under good weather  
10 conditions about ................................. knots on a consumption of about ................................. tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,  
11 now trading ................................................

12  
13 .............. and _Trans-Pacific Carriers Co. Ltd._ ..................................... Charterers of the City of _Seoul, Korea._  
14 **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for  
15 about _20 (twelve days, minimum 60 to maximum 190 days via safe port(s), safe berth(s), safe anchorage(s), always afloat, always_  
16 _accessible and always within IWL with lawful, harmless cargoes. (location first leg: Cement Clinker)_ ................................................  
17 limits.  
18 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for  
19 the fulfillment of this Charter Party.  
20 Vessel to be placed at the disposal of the Charterers, at _dropping last outward sea pilot Kosichang, Thailand, any time day or night, Sundays_  
21 _and holidays included_ ..................................................  
22 ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause 6) as the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 6, Vessel before arrival at first loading port on her delivery to be~~ ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service (See Clause 47), having water ballast,  
23 windlass and  
24 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at once and the same  
25 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-  
26 dise, including ~~petroleum or its products in proper containers, excluding~~ See Clause 77 ..................................................  
27 ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small amount on deck at their risk,~~  
28 ~~all necessary fittings and other requirements to be for account of Charterers) in such lawful trades between safe port and/or ports in British North~~  
29 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~  
30 ~~Mexico, and/or South America,~~  
31 ~~and/or Africa, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~  
32 ~~October 21st and April 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~  
33  
34



35  at the Charters or their Agents shall direct, on the following conditions:
36      1.  That the Owners shall provide and pay for all provisions, *fresh water,* wages and consular shipping and discharging fees of the Crew; shall pay
37  for the Insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38  the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service with all certificates necessary to comply with *current requirements at all ports of call.*
39      2.  That the Charters shall provide and pay for all the fuel except ~~as otherwise agreed,~~ Port Charges, Pilotages, Agencies, Commissions,
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew and cargo prior to delivery to be for Owners account. Fumigations ordered because of
43  charter to be for Charterers account *including but not limited to crew transportation and accommodation.* All other fumigations to be for
44  Charterers account. ~~the vessel has been where the continuous service~~
45  of six months or more. *Fumigations at Charterers risk/expense/time.*
46      Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
47  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
48  for dunnage, they making good any damage thereto.
49      3.  ~~That the Charterers, at the port of delivery, and the Owners at the port of re-delivery, shall take over and pay for all fuel remaining in~~
50  ~~bunkers at the current prices in the respective ports, the vessel to be delivered with not less than~~ ~~tons and not more than~~
51  ~~tons of fuel to be delivered with not less than~~
52      4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$34,500 daily including overtime
53  payable *every 15 days in advance* ~~United States Currency, per Calendar Month~~ ~~commencing in accordance with Clause 51~~
54  ~~commencing~~ ~~per Calendar Month~~ ~~commencing~~ ~~supplying capacity, including bunkers and~~
55  and after the same rate for any part of a day; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
56  wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot one safe port Pennang/Japan Range, port in*
57  *Charterer's option, any time day or night, Sundays and holidays included unless otherwise mutually agreed. Charterers are to give Owners not*
58  *less than 20/15/10/7/5 days approximate and 3/2/1 day(s) definite*
59      5.  Payment of said hire to be made in *the Owner's nominated bank account See Clause 51 in New York* in cash in United States Currency,
60  *every 15 days semi-monthly* in advance, and for the last 15 days ~~or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes~~
61  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
62  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
63  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
64  *following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they*
65  *to have the privilege of using vessel at once, such time used to count as hire.*
66      *Subject to Owner's prior written authorization* Cash for vessel's ordinary disbursements at any port may be advanced as required by the
67  Captain, by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
68  of such advances.
69      6.  That the cargo be laden and/or discharged in any *safe dock or at any safe wharf/anchorage or place that Charterers or their Agents
70  may* direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar vessels to safely
71  lie aground,~~ the Charterers doing the handling.
72      7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
73  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers ~~as far as accommodations allow, Charterers~~



74 ~~paying Owner.~~

75 ~~interest in the completeness of the cargo of passengers, Charterers are to have such risk and expense~~
76 ~~incurred in the completeness of the cargo of passengers. Charterers are to have such risk and expense and~~

77 8.   That the Captain (although appointed by the Owners) shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
78 boats. The Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain *(although appointed by the Owners)* shall be under the orders and directions of the Charterers as regards employment and
79 agency; and Charterers are to load, stow, *trim, tally and discharge/load and trim/stow/secure and discharge* and trim the cargo at their *risk and expense* under the
80 supervision of the Captain, *who if required by Charterers* is to sign Bills of Lading for
81 cargo as presented, in order conformity with Mate's or Tally Clerk's receipts
82 ~~.~~
83 9.   That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
84 receiving particulars of the complaint, investigate the same, and if necessary, make a change in the appointments.

85 10.   That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *in port but not between ports or during*
86 ~~see passage and see that voyages are prosecuted~~ and see that voyages are prosecuted
87 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
88 rate of $1000 per day, Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers *and feed Charterers will sign a Letter*
89 *of Indemnity prior to its boarding in the usual P and I wording*, or their Agents, to victual Tally
90 Clerks, Stevedore's Foreman, etc., Charterers paying ~~at the current rates, wharf, watching~~ *with-victualling. See Clause 74.*

91 11.   That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
92 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
93 terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
94 sumption of fuel.

95 12.   That the Captain shall use diligence in caring for the ventilation of the cargo.

96 ~~13.   That the Charterers shall have the option of continuing this charter for a further period of~~
97 ~~employ vessel notice thereof to be to the Owners or their Agents~~

98 14.   That if required by Charterers, time not to commence before the *22nd August, 2007*
99 nor later given written notice of readiness on or before the *27th of August, 2007*
100 their Agents is to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *(February, 16-18h, August -* ~~and should vessel~~
*Redelivery 12-23 August 2007)*

97 15.   That in the event of the loss of time *arising from strike of Master/Officers/Crew or sickness/accidents of crew, deficiency or defect*

98 ~~deficiency of men or stores, fire~~, breakdown or damages to hull, machinery or equipment,
*which Owners are responsible under the terms of this Charter Party.*
99 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause for
100 preventing the full working of the vessel, the payment of hire shall cease for the time so lost, and if upon the voyage the speed be reduced by
101 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
102 thereof, and all extra expenses shall be deducted from the hire.

103 16.   That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
104 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
105 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

106 17.   The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
107 purpose of saving life and property.

108 ~~18.   That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York~~
109 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
110 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~ *See Clause 31.*

111 18.   That the Owners shall have a lien upon all cargoes, and all sub-freights, *freights, demurrages, hires, sub-hires,* for any amounts due under
112 this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
113 deposit to be returned at once, Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which



19. That all duties and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled, according to Rule J to 15, inclusive, 17 to 22, inclusive, and Rule F of York-Antwerp Rules 1974 or any amendment in London 1974 as same may take place in the United States as may be extended by the vessel, and as to matters not provided for by these rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the last day of discharge at port or place of final discharge of cash, damaged cargo shall be converted at the board and such additional security... Hire not to contribute to General Average.

20. Fuel used by the vessel while at off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.

21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

No drydocking except in case of emergency or when required by vessel's Underwriters or class.

22. Owners shall maintain the gear of the ship as fitted, providing gear (for all cranes derricks) capable of handling lifts up to three tons, also providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary for the gear, whenever this can be done, Charterers shall provide and pay for the hire of any extra gear and also for the cost of replacing same, to be agreed to as to quantity, and the cost of replacing equipment and gear for heavier lifts shall be for Charterers' account Owners also to provide on the vessel electric light as on board for night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The Charterers to have the use of any gear on board the vessel.

23. Vessel to work night and day, if required by Charterers, and all cranes winches to be at Charterers' disposal during loading and discharging. The Master to provide one winchman per hatch to work as required. Charterers agreeing to pay stevers, engineer, winchman, deck-hands and donkeyman pro rata for over-time work done in accordance with the working hours and rates stated in the ship's articles. If the rest of the workmen party, at whatever time working, prevent over-time driving, then Workmen to be paid by Charterers. In the event of a disabled winch or winches, or insufficient power to operate winches, Owners to pay for shore engines, or steamers, if required, and any time lost constitutes thereby.

24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to the navigation of vessels, etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of which are to be included in all bills of lading issued hereunder:

U.S.A. Clause Paramount

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.



160
161
162
163
164
165
166
167

Both-to-Blame Collision Clause

~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act neglect or default of the Master mariner pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.~~

168
169
170
171
172
173
174
175

25. The vessel shall not be required to enter any ice-bound port, or to remain in any port where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging. *Vessel not to trade to ice (See Clause 75).*

26. Nothing herein stated is to be construed as a denial of the vessel to the Time Charters. The owners to remain responsible for the navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.

27. A commission of *1.25* 2+½ per cent is payable by the Vessel and Owners to *Clarkson Melbourne Pty. Ltd., Melbourne,* and *1.25% to Doric Shipbrokers S.A., Greece* on the earned and paid under this Charter, and also upon any continuation or extension of this Charter.

28. An address commission of 2 1/2 per cent payable to Charterers.

*Clauses 29 to 106 and General Average, General Clause Paramount, New Both to Blame Collision Clause, New Jason Clause, Arbitration Clause, P & I Bunker Deviation Clause and Conwartime 1993 War Clause and Arbitration LOause are deemed to be a part of and incorporated in the Charter Party and all Bill(s) of Lading issued hereunder to incorporate all terms, conditions, liberties and exceptions of the time Charter Party and in particular the lien and Arbitration Clause to be fully incorporated in this Charter Party.*

CHARTERERS:-

OWNERS:

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form, printed under licence from the Association of Ship Brokers & Agents (U.S.A) Inc, using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.







## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 29.**
Charterers are entitled to deduct from last sufficient hire payments estimated
Owners disbursements as well as value of estimated bunkers on redelivery, In
case of any vessel's delay due to Owners matter vessel to be fully off hire.

Payment is not sufficient to cover value of estimated bunkers on redelivery (See
Clause 49 and 72) and estimated amount disbursed for Owners account from
penultimate hire payment. Charterers to produce supporting evidence from such
deduction as soon as same are available.

**Clause 30.**
At or off port, crew to perform if weather permitting first opening and last closing
of hatches where and when required if permitted by local
regulations/union/authority, however, crew always to assist in opening and/or
closing hatches in case of emergency if permitted by local
regulations/union/authority.

**Clause 31.**
That should any dispute arise between Owners and Charterers, the matter in
dispute shall be referred to Arbitration in London, in accordance with English
Law. This Charter Party shall be governed by and construed in accordance with
English Law.

In the event one of the parties serves a notice of appointment of its arbitrator and
the other party fails to appoint its arbitrator within 14 days the party that has
appointed the arbitrator will serve one final notice to the defaulting party and in
the event the defaulting party does not appoint an arbitrator within 7 days then
the arbitrator appointed will act as sole arbitrator and as one appointed by mutual
consent.

Arbitration shall be conducted in accordance with the rules and procedures of the
London Maritime Arbitration Association rules and procedures in force at the time
arbitration is declared. Should the claim and counter claim (if any) not exceed
US$50,000 (United States Dollars Fifty Thousand) excluding legal fees, tribunal
costs and interest, then arbitration shall be conducted in accordance with the
simplified rules and procedures of the London Maritime Arbitration Association in
force when arbitration is declared.

1





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 32.**
Owners to supply valid certificates, for the agreed trading limits and such certificates to be maintained throughout the period of charter. Any consequences due to vessel lacking necessary certificates, or if same should be out dated, to be for Owner's risk and expense to the extent Charterers operations are hindered. Vessel's cargo gear and all other equipment shall comply with the regulations of the countries to which the vessel may trade, and Owners are to ensure that the vessel at all times in possession of valid and up-to-date certificate of efficiency to comply with such regulations. If stevedores, longshoremen or other workmen are not permitted to work due to failure of Master and/or Owner's Agents to comply with the aforementioned regulations or because vessel is not in possession of such valid and up to date certificates. The vessel to be off hire for the time actually lost. Vessel has lighting apparatus for night work in all holds simultaneously.

**Clause 33.**
Should any damage be caused to the vessel or her fittings by Stevedores, Master has to try to let the Stevedores repair the damage and will try to settle the matter directly with them at the first stage. If the damage is not repaired by the Stevedores, Master has to endeavour to obtain written acknowledgement of the damage and liability from Stevedores otherwise Charterers shall not be responsible for the damage. Master is to notify Charterers or their Agents of such damage within 48 hours of occurrence or on discovery of same, in case of hidden damage. Charterers have the privilege of redelivering the vessel without repairing the Stevedore damage for which the Charterers are responsible, incurred during the currency of this charter as long as the damage does not affect the seaworthiness/cargo worthiness survey report ascertained by independent Lloyds surveyor or joint survey between Charterers representative and Master/Chief Engineer who is to quantify the extent of damage (such cost of damages to be settled by Charterers upon receipt of such survey) but repair time for Charterer's account if such time exceed the time necessary for Owners to carry out their own other works of repair. Stevedore damage affecting seaworthiness and/or cargo worthiness of the vessel shall be repaired without delay to the vessel after each occurrence in the Charterer's time and shall be paid for by the Charterers.

**Clause 34.**
Master shall supervise stowage of cargo as well as instruct one of his Officers to supervise all loading, handling and discharging of the cargo and he is to furnish Charterers with stowage plan as well as other documents customarily used.

2

08-OCT-2007  16:24   FROM                              TO  28772633                    P.08





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 35.**
The Charterers shall not be liable for loss nor personal injury nor arrest or seizure or loss or damage to the vessel or other objects arising from perils covered by the usual policies and conditions of Hull and Marine Insurance at Owner's Underwriters unless caused by Charterers or their servants and/or agents negligence.

**Clause 36.**
In the event of vessel deviating (which expression includes putting back or putting into any port other than to which she is bound under the instructions of Charterers) for any cause or for any purpose which would result in payment of hire being suspended under any provisions of this Charter, no hire shall in any case be payable as from the commencement of such deviation until the time when the vessel is again ready and in an efficient state to resume her service from a position not less favourable to Charterers, than that at which the deviation is commenced.

In the event of the vessel for any cause or for any purpose aforesaid putting into any port other than the port for which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners.

**Clause 37.**
Vessel is currently insured for the full hull and machinery value (including I.V.) but Owners have the right to adjust insured value of hull and machinery from time to time with notice to Charterers of the changes. Owners P and I Club is:

Owners agree that the Charterers will enjoy and are being entitled to same coverage by ship's protection and indemnity club as if vessel were operated by Owners themselves provided rules permit.

**Clause 38.**
Owners guarantee vessel is not black listed by trading countries due to vessel's ownership/operators/age and whatsoever.
Vessel to comply with Australian/New Zealand trading.
Vessel has no relation to ex-Yugoslavia in vessel's flag/ownership/crew/etc.

**Clause 39.**
Charterers agree to instruct their agents to undertake normal ship's husbandry on behalf of Owners without agents fee to Owners. However, this shall not include any extra ordinary business such as crew joining/leaving ship, crew

3





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

repatriations and/or hospitalization in which case Owners shall appoint their own agents, or appoint Charterer's agents as Owner's agents.

In any event, Owners have the option to appoint their own husbandry agents if so desired by them.

**Clause 40.**
Any dues and/or taxes on cargoes and/or freight and/or hire due to Charterers trade and domicile to be for Charterer's account, excluding taxes levied by the country of the flag of vessel and Owners.

**Clause 41.**
Deleted.

**Clause 42.**
Owners to supply on delivery and to maintain during the service, valid deratization exemption certificate.

The cost of any fumigation necessary to obtain extension or renewals of deratization exemption certificates to be for Owner's account and time actually lost to be off hire. Hold fumigation due loaded cargo for Charterer's account.

**Clause 43.**
Charterers to be responsible for fines imposed in the event of smuggling by Charterers employees and/or Charterers Agents but Owners to be responsible for any such acts of their own officers and/or crew. Charterers to remain responsible for detention of the due to smuggling committed by Charterers employees and/or Charterers Agents only.

**Clause 44.**
Should the vessel be arrested during the currency of this Charter Party at the suit of any person having or purporting to have a claim against or any interest in the vessel hire under this Charter Party shall not be payable in respect of any time actually lost by Charterers whilst the vessel remains under arrest and remains unemployed as the result of the arrest. Owners shall reimburse the Charterers for any proven expenditure Charterers may incur under the Charter Party in respect of any period during which she is arrested.

This Clause shall be inoperative should the arrest be caused through any fault or omission of Charterers and/or their Servants and/or Agents.

4





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 45.**
If, during the currency of this Charter Party, there is any deviation during the course of the voyage or any loss of time whatsoever caused by sickness of, or accident to crew or any person other than Charterers servants on board the vessel, hire shall not be paid for the time so lost and the cost of extra fuel consumed any extra expenses incurred shall be for the Owners account.

**Clause 46.**
Officers and crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available on board, otherwise any detention and fines resulting from not having these certificates on board to be for Owners account except for the quarantine detention imposed by authorities due to the vessel having traded to country, or port affected by contagious disease/plague under this charter period. Further, the vessel shall be in possession of valid certificate necessary to prepare radio pratique at all port or ports where normal radio pratique is available.

**Clause 47.**
Vessel's holds on delivery to be clean/swept/washed down by fresh water and dried up so as to receive Charterers intended cargoes in all respects, free of salt, loose rust scales and previous cargo residue to the satisfaction of independent surveyor at load port. If vessel fails to pass any hold inspection as above, the vessel should be placed off hire from time of rejection until the vessel passes the same inspection again.

**Clause 48.**
As long as Charterers fulfill their financial obligation to Owners, the Owners undertake to instruct the Master to authorize, in writing, the Charterers or Charterers agents to issue and sign Bills of Lading on Charterers usual form on Owners and Masters behalf for cargo.

Charterers and/or their agents have option to sign Bills of Lading on behalf of Master in accordance with Mate's or Tally's receipts without prejudice to this Charter Party. The entire responsibility for proper delivery of the cargo to the receiver(s) at all discharge ports shall rest at all times with the Charterers.

As long as Charterers have fulfilled their financial obligations, Owners are to allow Charterers to discharge entire cargo without presentation of original Bill(s) of Lading and Charterers provided Letter of Indemnity signed by Charterers only. The L.O.I. to be accompanied with copies of all original Bills of Lading to which it refers.

5

 

## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

Charterers agree to indemnify and hold Owners harmless from any and all claims, cost, expenses and/or liability resulting from or arising out of Charterer's failure to obtain the original Bill(s) of Lading.

It is clearly agreed that no liner Bills of Lading will be issued under this Charter Party unless Owners prior consent is obtained.

**Clause 49. Bunker Clause**
Vessel to be delivered with about 800/900 metric tons IFO and about 75 metric tons MDO. Bunkers on redelivery to be about same as on delivery.
Same prices at both ends – US$425.00 per metric ton for IFO and US$675.00 per metric ton for MDO.
Bunkers on delivery payable with first hire payment and estimated bunkers on redelivery to be deducted from last sufficient hire payment.

**Clause 50. Vessel's Description**
MV STENTOR
BC/LOGGER, BUILT JAN 2006 SHIMANAMI SHIPYARD (IMABARI GROUP)
28,445 MT ON 9.78M
BAHAMAS FLAG - NKK CLASS
GT/NT16960/10498
LOA/BEAM 169.26/27.24M
5 HO/HA
CARGO GEAR: 4 X 30.50T CR
HATCH SIZES: NO.1  13.60 M X 16.00 M NO.2 TO 5  19.20 M X 17.60 M
GRAIN/BALE 37523.01CBM / 35762.45 CBM OR 1325125/1262954CBFT
UNIFORM TANK TOP STRENGTH 15 TNS/SQM
STRENGTHENED FOR OF HEAVY CARGOES, HOLDS NO.2 + NO.4 MAY BE EMPTY
CO2 FITTED/AHL
STEEL PERMANENT AND COLLAPSIBLE STANCHIONS FITTED
SPEED/CONSUMPTION ARE ABOUT, UNDER GOOD WEATHER CONDITION I.E. THE WIND NOT EXCEEDING B4, THE SEA STATE 3 AND NO ADVERSE CURRENT/SWELL/DECK CARGO
ABOUT 13.5 KNOTS ON 22 TONS IFO 180CST
IN PORT: WORKING 4MT IFO, IDLE 2.5MT IFO.
'RME 25' FOR IFO 180 CST AND 'DMB' FOR MDO BOTH ISO 8217/1996 (E).
VESSEL HAS LIBERTY TO USE MDO FOR MANOUVERING IN NARROW WATERS, CANALS, RIVERS, ON ENTERING/LEAVING PORTS AND IN ADVERSE WEATHER.
ADA/WOG

6

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 51.**
Hire to be telegraphically remitted, free of bank charges to Owner's bank:

Eurobank Ergasias SA
Akti Miaouli Branch
Piraeus, Greece
Swift Code: EFGBGRAA
IBAN: GR380 2600 290000 25 1200 268266
Corresponding Bank in New York: Deutsche Bank Trust America New York
Swift Code: BKTRUS33
In favour of: Naias Marine S.A.
Account Number: 026.029.25.1200268266

Payment of first hire and value of estimated consumable bunkers to be paid within 3 banking days after vessel's delivery and Charterers receipt of faxed invoice in Seoul.

Charterers are entitled to deduct from last sufficient hire payments estimated Owners disbursements as well as value of estimated bunkers on redelivery in case of any vessel's delay due to Owners matter vessel to be fully off hire.

**Clause 52.**
Hull and bunker on-off hire survey to be held.
Time/cost to be shared equally between Owners and Charterers.
Owners option to be represented by Master/Chief Engineer in which case each party to take over the corresponding cost.
Surveys to be arranged and take place in such manner so that vessel not to be off hire.

**Clause 53.**
Deleted.

**Clause 54.**
Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters (as and when received from Underwriters) by reason of the vessel being in port for a minimum period of a calendar month, if on full hire for this period or pro rata for the time actually on hire as far as the rules permit.

7





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

**Clause 55.**
Basic War Risk Insurance to be for Owner's account. Any additional or extra War Risk Insurance and extra crew war bonus, if any, due to vessel trading in Charterers service to be for Charterer's account.

**Clause 56. Pollution Charter Party Clause**

1. Owners warrant throughout the currency of this Charter they will provide the vessel with the following certificates:
    (A) Certificates issued pursuant to the Civil Liability Convention 1969 ("C.L.C.")
    (B) Certificates issued pursuant to Section 311(P) of the U.S. Federal Water Pollution Act, as amended (Title 33, U.S. Code, Section 1321 (P)).
    (C) Certificates which may be required by U.S. Federal legislation at any time during the currency of this Charter provided always that such legislation incorporates the C.L.C. as amended by the 1984 Protocol thereto or contains provisions equivalent thereto.

2. Notwithstanding anything whether printed or typed herein to the contrary:
    (A) Save as required for compliance with paragraph 1 hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.
    (B) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the cost of any delay incurred by the vessel as a result of any failure by Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of the vessel's inability to perform as aforesaid.
    (C) Owners shall not be liable for any loss, damage, and liability or expense whatsoever and howsoever arising which Charterers and/or the holds of any Bill of Lading issued pursuant to this. Charterers may sustain by reason of the vessel's inability to perform as aforesaid.

3. Charterers warrant that the terms of this Clause will be incorporated effectively into any Bill of Lading issued pursuant to this charter.

8





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 57.**
Cranemen and stevedores always to be appointed/employed and paid by
Charterers.

It is mutually agreed that the crew of the vessel has to co-operate in rendering
the services as performed and customary on Owner's own vessels according to
the direction of the Charterers respectively their agents. Owners undertake to
instruct ship's command accordingly. Any lashing etc., if and when required will
be done by shore gang or others for Charterer's account. Crew to perform such
work if local regulations/port authorities permit and for such work by Master/Crew
they are servants of the Charterers and work is done at Charterer's time/risk
expense crew remuneration to be agreed with Owners and to be paid to Owners
in the first place.

The vessel's officers and crews to shall perform extra work, if so requested by
the Charterers, such as setting stanchion, lashing, relashing of cargo or
collecting and providing of dunnage and/or lashing materials including catwalks,
cargo marks, painting and etc., provided and subject that shore and labour
union's regulations permit/allow.
Charterers shall pay US$4000 lumpsum per voyage for above extra work directly
to the Owners. Such amount excludes providing necessary material for eventual
catwalk and cargo marks are to be for Charterers account.
Crew to assist in lashing/lashing-always acting as Charterers servants.
When logs loaded on deck, subject to weather conditions, vessel's speed may be
reduced upto half "knot."

1) The crew shall be considered as servants of the Charterers when
   performing this work.
2) The work shall be done at Charterer's time and expense.
3) Trimming is to be performed and completed by Shipper's stevedores to
   the satisfaction of Master, prior to the vessel's Crew commencing lashing
   work.
4) All lashing work is to be performed while the vessel is alongside or in
   anchorage.

**Clause 58.**
When hire is not received by Owners at the due date on account of delays
beyond the Charterer's control Owners to give Charterers 2 banking days notice
in order to rectify the cause for such delay before exercising their rights under
Clause 5 of the charter.

9





## ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 59.**
Should the vessel be boycotted at any port or place by shore and/or port labour and/or tugboats and/or pilots, or by government authority, by reason of the vessel's manning or ownership or terms and conditions on which members of the Officers/Crew are employed, or by reason of trading of the vessel (except for trading during currency of this Charter), any extra expenses incurred therefrom shall be for Owner's account and the Charterers are entitled to place the vessel off hire any time lost by such reasons. If the boycott shall be caused by Charterers and/or their servants and/or their agents, then this clause shall be inoperative and the vessel shall remain fully on hire.

**Clause 60.**
In lieu of hold cleaning: US$4,500.00 lumpsum including disposal/removal of dunnage/lashing materials/debris/bark.
Intermediate hold cleaning: US$500.00 per hold.

**Clause 61.**
Charterers or Owners are at liberty to cancel this Charter Party in case of war, whether declared or not, between any of the following powers: U.S.A., Great Britain, Japan, Russia and People's Republic of China, South Korea, New Zealand and Liberia.

**Clause 62.**
Deleted.

**Clause 63.**
All negotiations and eventual fixture to be kept private and confidential.

**Clause 64.**
Owners shall have the liberty of using Diesel Oil whilst entering and leaving port and for manoeuvring in shallow water.

**Clause 65.**
General Average, General Clause Paramount, New Both to Blame Collision Clause, New Jason Clause, Arbitration Clause, P & I Bunker Deviation Clause and Conwartime 1993 War Clause and Arbitration Clause are deemed to be a part of and incorporated in the Charter Party and all Bill(s) of Lading issued hereunder. All Bill(s) of Lading to incorporate all terms, conditions, liberties and exceptions of the time Charter Party and in particular the lien and Arbitration Clause as applicable.

10





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 66.**
Cargo claims to be settled between Owners and Charterers in accordance with
Interclub N.Y.P.E. Agreement as amended May 1984 and any subsequent
amendments and/or re-enactments of same. Neither party will involve any time
limit as a defense between themselves.

**Clause 67.**
Deleted.

**Clause 68.**
Export and/or import permits for cargo to be at Charterer's risk and expense.
Charterers to obtain and to be responsible for all necessary permits to enter
and/or trade in/out of all ports during the currency of this charter at their own risk
and expense.

**Clause 69.**
Owners have the option to supply bunkers prior to redelivery provided not
interfering with Charterer's operations.

Charterers also have the option to supply bunkers prior to redelivery provided not
interfering with Owner's operations.

**Clause 70. Bimco Bunker Quality Control Clause Fuel Grade (IFO/MDO):**
Charterers guarantee to supply vessel with bunkers of minimum standards of
"RME 25 or RMF 25" for IFO 180 CST and "DMB" for MDO.  Bunker
specifications to be in accordance with international standards at those set by the
ISO 8217/2005 (E) and always in compliance with Marpol Annex VI
requirements.
Bimco Fuel Sulphur Content Clause for TCP to apply.

**Clause 71.**
Deleted.

**Clause 72.**
First hire, cables/entertainment/victualling plus bunkers on delivery values to be
paid within three banking days after vessel's delivery and receipt of faxed invoice
in Seoul.

**Clause 73. Trading Exclusions**
Notwithstanding anything else contained in this Charter Party the Charterers
agree that vessel will not trade any area which is now or which may be in the
future designated by Lloyds and/or vessel's hull underwriters as a war zone

11





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

trading always within Institute Warranty Limits and always excluding the following countries:

Israel, Turkish occupied Cyprus, Denmark, Norway, Finland, Sweden, Cuba, Iraq, North Korea, CIS Pacific, Somalia, Liberia, Yemen, Eritrea, Sierra Leone, Mauritania, Alaska, Oregon State and any other place which vessel is from time to time prohibited to call by the national authorities under which the vessel is registered.
Vessel not to trade directly between China and Taiwan.
Conwartime 1993 War Risk Clause to apply.

Vessel not to be ordered to nor bound to enter:

(a) Any places where epidemics are prevalent or to which the Master/crew by law are not bound to follow vessel and in countries/ports where the vessel may be infested by Asian Gypsy Moth i.e. CIS Pacific or Japanese ports which are included in the AGM alert list as per USDA regulations i.e. Chiba, Hachinohe, Hakodate, Hiroshima, Oita, Sakata, Shimizu, Tomakomai.
(b) Any ice-bound port or place or any port or place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice or vessel's arrival or where there is risk that the vessel will not be able on account of ice to reach the port or place or to depart therefrom after completion loading or discharging. If on account of ice the Master considers it dangerous to remain at the loading or discharging port or place for fear of vessel being frozen in and/or damaged, the Master shall have liberty to sail to a convenient port or place and await Charterer's fresh instructions.
(c) The vessel shall not be obliged to force ice, nor to follow ice breakers. All countries which are not in compliance with International Ship and Port Facility Security (ISPS) Code and therefore lack of effective anti terrorism measures, i.e. following countries are reported by US Coast Guard not in compliance: Albania, Democratic Republic of Congo, Guinea-Bissau, Liberia, Madagascar, Mauritania, Nauru.
(d) No direct call between Taiwan and People's Republic of China is to be permitted.

### Clause 74. Cables, Victualling and Entertainment
Charterers to pay Owners lumpsum US$1,250 (United States Dollars One Thousand, Two Hundred and Fifty) per month or pro rata for all victualling/cable charges/entertainment/etc.

 

## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 75.**
Deleted.

**Clause 76.**
Subject to vessel's stability/trim and provided deck strength/space permitting Charterers have the option of loading cargo on deck at Charterer's/Shippers entire risk without any liability to Owners/Vessel for whatsoever cause, and Charterers undertake to procure that Bills of Lading to be so claused (See Clause 78 and 79). Charterers undertake to supply on board at their expense all dunnages (if Master considers necessary) and all lashing/securing materials (except for logs and/or lumber and/or wood products for on deck only) and/or any other extra fitting/equipment/materials requisite for safe stowage/carriage and to have such deck cargo dunnaged/stowed/lashed/secured to the satisfaction of Master. Any extra expenses resulting therefrom/incurred thereby and detention through any of above causes to be for Charterer's account.

**Clause 77. Cargo Exclusions**
The vessel shall be employed in carrying lawful merchandise in accordance with the requirements or recommendations of the competent authorities of the country of the vessel's registry and of ports of shipment/discharge and of any intermediate countries or ports through whose waters the vessel must pass.

Charterers warrant that all cargoes to be loaded/stowed/carried and discharged in strict conformity with I.M.O. and local regulations and BC Code. Any extra fittings/equipment/etc. which are required to observe such regulations to be undertaken by Charterers at their time/expense. Charterers will hold Owners harmless against all and any consequences that may arise and will indemnify Owners for all and any damages and/or losses Owners may suffer as a result of any failure in this respect.

None of the cargoes, goods, or substances listed below are to be loaded during the currency of this Charter:
All corrosive, dangerous, explosive and/or combustible, hazardous, inflammable, injurious and toxic substances/cargoes or goods or substances listed in the IMO-IMDG Code 1990 Consolidated Edition and any subsequent new edition thereof or amendments thereto as well as listed on BC Code Appendix B.

Without prejudice to the generality above following cargoes are specifically excluded:

    A.  Acids, ammonium nitrate, ammonium nitrate fertilizers except harmless non hazardous type, ammonium nitrates fertilizers Class B, ammonium

13

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14TH AUGUST, 2007

phosphate, ammonium sulphate unless fertilizer grade, alumina, aluminium ashes, aluminum nitrate, aluminium ferrosilicon, aluminium dross, aluminium residues, aluminium silicon powder, aluminium smelting by-products, ammonia, ammunition, andalusite, animals, arms, asbestos, ashes, asphalt and/or its products, ammonium chlorine,

B. Bauxite, barium nitrates, bitumen, black powder, blasting caps and detonator caps, brown coal and brown coal briquettes, boycotted cargoes, bones or bone meal, borax, bombs, bullion

C. Calcined pyrites Class B, calcium nitrates Class B, calcium carbide, calcium chloride, calcium fluoride, calcium hypochlorite, calcium hyperchlorite, calcium oxide, calcium oxychloride, carbon black, caustic potash, castor beans, chemical wastes, chrome ore and sand, charcoal, charcoal briquettes, chipped bone, Chilean natural nitrates, Chilean natural potassic mixture, clay, coal, cocoa, coffee, concentrates, copra pellets/products, copra, corrosives, cotton and cotton waste, containers, creosote and creosoted goods, carbite, caustic soda, cottonseed expellers

D. Deck cargoes except logs and timber, dynamite, direct reduced iron in any form, iron swarf, iron oxide, direct reduced iron ore pellets, hot briquetted iron, drugs,

E. Esparto grass, essential oil, explosives

F. Ferrous meal, ferro manganese, ferro silicon, fertilizers except non hazardous and non IMO class, fertilizers to Australia, firearms, fire briquettes, fireworks, fishmeal, fishscrap, ferrous metal, fluorspar,

G. Gaseous coal, gasoline, granite blocks and other stone blocks, gypsum

H. Hypochlorite solutions, hides, HBI

I. Jute

J. Kaolin Clay

K. Ilmenite, Indian coal/coke, iron ore fine or pellets metallized, iron carbide/oxide spent, isotopes,

L. Lead calcined or sulphide or nitrate, lime, livestock, limestone, loaded bombs

M. Magnesia, magnetite, magnesium nitrate, manioc, manioc pellets, metal sulphide, milled rice, Mississippi coal, motor spirit, mineral sands, motor blocks

N. Nefiline syenite, naphtha, nitrates, nitro glycerin, nigerseed, nitrate of soda, nuclear substances or fuels or cargo or wastes

O. Oil cakes or seeds or palm kernels, oily pieces, oily expellers, organic peroxides, olivine sand

P. Palm kernels, petroleum derivatives and all petroleum products, pig iron, pitch, pitch prill, poultry, pond coal, potassium chloride, potassium/sodium nitrate, potash, petcoke, pesticides, paper products, pollard pellets, pyrites, prefabricated and mobile buildings





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

Q. Quebracho, quicklime

R. Radioactive substances or wastes of any kind, products or waste, rags, radio isotopes, rape seed expellers, resins, refrigerated cargo, refuse and garbage of any kind, rock salt, rutile san, rice

S. Salt, saltpetre, metal in any form including motorblocks, turnings and swarf, silicon and silicon manganese, silica sand, silver sand, sludge ore, solvents, sodium nitrate or sulphate, specie, sponge iron, sulphate in bulk, sulphur, sunflower seeds and expellers/pellets and cakes, soda ash, sawdust, seed cakes Class B, sodium and potassium nitrate

T. Taconite, tankage, tar, tar and all its products, tea, tobacco, TNT, titanium slag, technical urea, toxic waste, turpentine,

U. Vanadium ore, vermiculite, vehicles

V. Waste and old paper, wet hides, woodchips and wood pulp pellets both with less than 15 percent moisture

W. Yachts, yellow phosphorus

X. Zircon sand, zinc ashes, zinc dross and residue and all it products.

Notwithstanding the above Charterers are allowed to carry with Owners specific prior consent which is not to be unreasonably withheld the following:

Concentrates excluding lead concentrates always provided that carried in accordance with the terms of the Charter party and to be in full conformity with and to be loaded/carried/stowed/discharged in accordance with IMO and/or local authorities regulations/recommendations and certificate of water contents to be within safety margin for water transport as ascertained by IMO Code. Charterers are fully responsible for all time/cost/expenses pertaining to the carriage of concentrates including but not limited to certification/surveys required for carriage of this cargo.

HMS 1 & 2 or shredded scrap, non oily and allow excluding M.B.T. Charterers to observe soft loading clause whereby first layers of scrap to be gently lowered and loaded on vessels tank top forming a cushion prior balance cargo loaded to Master's satisfaction. When scrap loaded, the first load/layer of scrap in each hold to be lowered as/low/close as possible to bottom of the hold to provide a proper flooring and cushion for loading balance of cargo to Master's satisfaction.

In the event that Charterers load IMO and/or IMDG listed cargoes (always in accordance with the Charter Party) then they are to reimburse Owners for any extra expenses incurred by owners as a result including extra fittings and in case IMO/IMDG and/or local and/or national authorities require special documentation for any cargoes covered by IMO/IMDG Codes Charterers to be responsible for obtaining same at their time and expense.

15





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 78.**
Owners guarantee that vessel is fully logs fitted with steel stanchions. Owners guarantee that vessel has sufficient lashing materials and other equipment including certificates for loading full cargoes of log on and under deck.

**Clause 79.**
Master and Owners are not responsible for loss and/or damage to deck cargoes howsoever caused.

**Clause 80.**
Deleted.

**Clause 81.**
Owners and Master to undertake best efforts to co-operate with Charterers for best stowage of cargo and cargo fumigation if necessary at Charterer's time and expense.

**Clause 82.**
If vessel is off hire for a consecutive period of 30 days Charterers have the right to cancel this Charter Party without any further obligation under this contract on the part of the Charter, having first discharged cargo.

**Clause 83.**
In the event of breakdown of crane or cranes, or, winch or winches, by reason of disablement or insufficient power, the hire to be reduced pro rata for the period of such inefficiency, if any loss of time in relation to the number of cranes available, Owners to pay in addition the cost of labour either idle or additionally engaged, but limited to one shift only for each breakdown but Charterers not to order labour against already disabled crane(s). Because of the breakdown Owners to hire shore appliances, if available, if required by Charterers, but maximum daily cost not to exceed daily time charter hire however in such case vessel to remain on full hire unless loss of time should occur.

**Clause 84.**
Gangway watchmen to be from vessel's crew and for the cargo to be for Charterer's account, compulsory shore gangway watchmen, patrol watchmen or watchmen for all purposes to be for Charterer's account.

16





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 85.**
In case Charterers require fumigation of the cargo at discharge port, time and expense of same to be for Charterer's account and Officers/crew are to be provided with suitable hotel/accommodation at Charterer's expense.

**Clause 86.**
Compulsory garbage removal to be for Charterer's account.

**Clause 87.**
The vessel is fitted with hold ladders to current Australian WWF regulations and any dispute on this matter at load ports to be for Owner's responsibility and time lost or expenses incurred thereby to be for Owner's account.

**Clause 88.**
Notice on fixing.

**Clause 89.**
For the purpose of computing hire payments, time for delivery/redelivery shall be adjusted to GMT.

**Clause 90.**
Vessel to be left in seaworthy trim to Master's satisfaction at all times between ports and at sea.

**Clause 91. Hamburg Clause**
Neither the Charterers nor their Agents shall permit the issue of any Bill of Lading, Way Bill or other document evidencing a contract of carriage ( whether or not signed on behalf of the Owner or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. The Charterers shall indemnify the Owners against any liability, loss or damage, which may result from any breach of the foregoing provisions of this clause.

**Clause 92.**

The Bill of Lading to be decided by Charterers; tally and measurement and tally to be arranged and paid for by Charterers at both loading and discharging ports if required. But if Owners require tally to protect their own interest which will be for Owners time/account. Master to promptly notify Charterers or their agents of any damage to and/or cargo of which he became aware during the period of this charter.

17

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 93.**

Bimco Standard ISM Clause to apply.

From the date of coming into force of the International Safety Management (I.S.M.) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "The Company" (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expenses or delay caused by failure on the part of the Owners or "The Company" to comply with the I.S.M. Code shall be for the Owners account.

**Clause 94.**

Bimco Y2K Clause to apply.

**Clause 95. New Both to Blame Collision Clause**

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the Untied States of America, following clause to apply:-

"If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants of the carrier in the navigation or in the management of the vessel, the Owners of the cargo carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of said cargo, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying vessel or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

18





## ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 96. Intermediate Holds Cleaning**
Any intermediate hold cleaning(s) if required by Charterers shall, in Charterers option, be performed by either the vessels crew or by shore labour at Charterers time/expense. If Charterers request services of crew for intermediate cleaning then this cleaning to be performed whilst vessel is en route to next loading port provided the time of ballast leg is sufficient for the work and the weather suitable, or in port provided shore regulations permit. If this option is declared then Charterers are to pay Owners US$500 per hold for each occasion. All intermediate cleaning, even if effected by crew, are carried out at Charterers risk and in Charterer's time, (crew acting as Charterer's servants) and should vessel's holds be subsequently rejected and any further cleaning etc. be required then these expenses and time used always to be for Charterers account. Any special equipment and/or materials/chemicals etc which may be required for hold cleaning are always to be provided and paid for by Charterers.

**Clause 97.**
Owners to allow transit fumigation as per IMO regulations. If required by Charterers the cargo is to be fumigated en route from the load port(s) to the first discharge port. This fumigation procedure involves the use of the product phosphine. But all loss and damage and expenses to be for Charterer's account.

**Clause 98.**
Owners guarantee that vessel's holds are to be clear of any fittings/superstructures such as car deck, curtain plates, container fittings whatsoever.

**Clause 99.**
Owners guarantee that vessels hatch covers are to be watertight all throughout this charter period and if any hatch cover is found to be defective, same to be rectified at Owner's time and expense to class satisfaction. Charterers also have the right to carryout hose test on all hatches at any time during this charter.

**Clause 100. Safe Stowage and Trimming**
Charterers are to leave the vessel in safe and seaworthy trim and with cargo on board safely stowed, dunnaged and secured to the Master's satisfaction for all shifting between berths and all passages between ports under this Charter in their time and at their expenses.

Separations between cargoes, other than natural, to be for Charterers account/risk and expense.

19

08-OCT-2007  16:33   FROM                                    TO   28772633                    P.25





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 101. BIMCO U.S.A. Security Clause for Time Charter**
If the vessel calls in the United States including any U.S. territory the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in the Charter party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspection, shall be for the Charterer's account, unless such costs or expenses result solely for the Owners negligence.

**Clause 102. Pre Loading Survey for Steels**
In the event Charterers load finished steel products they will tender notice to Owners prior to such loading in order Owners to arrange for a preloading survey on the cargo to be loaded. The cost of such survey will be shared equally between Owners and Charterers and both parties will receive copies of the pre-loading survey of such cargo.

**Clause 103. Bimco Stowaway clause**
i)   The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

ii)  If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to berate of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever, which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers account and the vessel to remain on hire.

iii) Should the vessel be arrested as a result of the Charterers breach of charter according to sub-clause (A) ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

B)
i)   If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and however incurred, including fines, shall be for the Owners account and the vessel shall be off-hire.

20





## ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14TH AUGUST, 2007

ii)    Should the vessel be arrested as a result of stowaways having gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure the release of the vessel.

**Clause 104**

Charterers option to weld padeyes on deck / hatch cover / in holds at Charterer's time/expense and same to be removed prior to redelivery otherwise Charterers option to redeliver vessel without removal padeyes by paying US$10 per each padeye.

No welding of padeyes at places which will adversely affect vessel's epoxy coat, wing tanks or double bottoms or fuel/diesel tanks. Padeyes to be welded to Master's satisfaction which not to be withheld unreasonably.

**Clause 105. Deck Cargo Clause**

Charterers are permitted to load on the vessel's deck and hatch covers always provided that the permissible loads on the deck/hatch covers are not exceeded, that the stability of the vessel permits and that such cargo does not affect the seaworthiness of safe navigability of the vessel in any manner. Any extra fittings required for deck or hatch cargo are to be provided and paid for by the Charterers who are to load, stow, dunnage, lash and secure, unlash, tally such cargo in their time, risk and expense always to the entire satisfaction of the Master.

The vessel is not to be held responsible for any loss of or damage to the cargo carried on deck and Charterers to keep Owners always harmless for all delays/consequences/losses howsoever caused including cost/delays in placing of security/guarantees.

In the event that cargo is shipped on deck during this charter, Charterers are to ensure that separate Bills of Lading are issued covering such cargo that those Bills of Lading are claused as follows:

"Shipped on deck at Charterers/Shippers and Receivers risk, expenses and responsibility, without liability on the part of the vessel, or her Owner for any loss, damage, expenses or delay howsoever caused" or voyages to and from ports in the U.S.A. – "carried on deck at Shippers risks as to perils inherent in such carriage, but in all other respects subject to the provisions of the United States Carriage of Goods by Sea Act 1936."

08-OCT-2007  16:33    FROM                    TO   28772633              P.27





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 106,**

**A - ISPS CLAUSE FOR TIME CHARTER PARTIES**

(a)(i) From the date coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company." Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)(i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO / Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".*

(ii) Except as otherwise provided in this Charter Party, loss, damages, expense or delay(excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

B – Charterers P and I Club: SSM

C – Any shortages established in any other method whatsoever other than draft survey in which the Master participated and agreed/signed will for Charterers account and Charterers place relevant security in order vessel sail without delay.

Charterers undertake to appoint and pay for draft surveys at load and discharge ports. To the extent Charterers fail to do so then the Master will be deemed to have been authorized to perform these surveys on behalf of the Charterers. Such draft surveys will be conclusive evidence of the cargo discharged.

D – Bimco Fuel Sulphur Content Clause for Time Charter Parties
Notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Clause.
For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

23





## ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14TH AUGUST, 2007

### P AND I CLUB OIL BUNKERING CLAUSE

The vessel in addition to all other liberties shall have the liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading and discharge named in this Charter Party and may there take oil bunkers in any quantity at the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

### GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be adjusted according to York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the cargo, shippers, consignees, or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo.

If a salvage ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the cargo to the carrier before delivery."

### PARAMOUNT CLAUSE

The Hague Rules contained in the International Convention for the unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment shall apply to this contract, when no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactment's are compulsorily applicable, the terms of the said Convention shall apply.

24

**Rory Macfarlane**

| | |
|---|---|
| **From:** | dpl [dplim@tpckr.com] |
| **Sent:** | 18 October 2007 16:32 |
| **To:** | Rory Macfarlane |
| **Cc:** | Max Cross; Lee, Connie |
| **Subject:** | Fw: M/V STENTOR / TPT - RECAP |

I have just received recap from our biz team. Please confirm receipt.

Best regards / D. P. Lim

----- Original Message -----
From: WTae
To: dpl
Sent: Thursday, October 18, 2007 5:26 PM
Subject: Fw: M/V STENTOR / TPT – RECAP

----- Original Message -----
From: Baro G/L
To: HANDY
Sent: Thursday. October 18. 2007 5:24 PM
Subject: M/V STENTOR / TPT – RECAP

GOOD DAY

WE ARE PLSD TO RECAP THE TERMS AND CONDITIONS MUTUALLY AGREED
BETWEEN
TRANS PACIFIC CARRIERS CO LTD AS OWNERS AND  TPT SHIPPING LIMITED
AS CHARTERERS' ASF:-
MV STENTOR

BAHAMAS FLAG BUILT 2006 CLASS NK
SD LOGGER/BULK CARRIER
SUMMER 28,445 MT DWT ON 9.78M SSW / TPC 39.6
SUMMER TIMBER 29,784MT DWT ON 10.117M
LOA 169.26 M / BEAM 27.24M
GT 16,960 / NT 10,498
5 HH, 4 X 30.5T CRANES
HOLD CAPA (GRAIN/BALE M3)

| | GRAIN(CBM) | BALE(CBM) |
|---|---|---|
| | GRAIN | BALE |
| NO.1 | 5319.76 CBM | 5016.06 CBM |
| NO.2 | 8236.33 CBM | 7840.01 CBM |
| NO.3 | 8260.63 CBM | 7882.90 CBM |
| NO.4 | 8298.00 CBM | 7882.90 CBM |
| NO.5 | 7408.29 CBM | 7140.58 CBM |

==============================
TTL  37,523.01 CBM  35,762.45 CBM

STANCHION HEIGHT : NO.1~5 = 8.16M~8.20M

(ALL DETAILS WOG)

- ACCT    TPT SHIPPING LTD.

- CARGO    ABT 25,000 JAS CBM 10% MOLOO / NEW ZEALAND LOGS
TO BE LOADED ON /UNDER DECK AT MASTER'S CONFIRMATIONS.
CHTRS GUARANTEE TO UTILISE DIGGERS IN THE HOLDS
FOR OPTIMUM STOWAGE.

- LOAD    1 SBP TAURANGA, NEW ZEALAND

- DISCH    1 SBP BUSAN OR INCHON. KOREA

- LAYCAN    03RD – 09TH NOV., 2007

- FREIGHT    USD 80.00 PER JAS CBM FIOST BSS 1/1

- TERMS    CQD BOTH ENDS BUT CHTRS GUARANTEE SUNDAYS AND HOLIDAYS
WORK AT DISCH PORT.

- OTHERS    FURTHER TERMS / CONDITIONS AS PER OUR LAST C/P WITH LOGICAL
AMENDMENTS

- COMM.    1.25PCT BROKERAGE EACH TO GREENLANE SHIPPING AND ONE
FORCE INTERNATIONAL

END OF RECAP